Filed 5/27/21

# CERTIFIED FOR PARTIAL PUBLICATION*

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# SECOND APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JESSALYN KENDY GRAHAM,<br><br>    Defendant and Appellant. | B300167<br><br>(Los Angeles County<br>Super. Ct. No. BA464605) |

    APPEAL from a judgment of the Superior Court of Los Angeles County.  Laura C. Ellison, Judge.  Affirmed.

    Carlo Andreani, under appointment by the Court of Appeal, for Defendant and Appellant.

---

*    Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication of the Introduction, Facts and Procedural Background, Part IV of the Discussion, and the Disposition.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Stacy Schwartz and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \*

After a woman's on-again, off-again boyfriend broke off their relationship for good, she stabbed him in the back and the heart. Literally. He survived the attack, and a jury convicted her of attempted premeditated murder with enhancements for personal use of a deadly weapon and personal infliction of great bodily injury. On appeal, she argues that the trial court got the jury instructions wrong, erred in not granting a midtrial continuance, erred in not referring her for a second competency hearing, and erred in not considering her for a pretrial diversion program she never requested. The final issue presents a question of statutory interpretation—namely, whether a request for pretrial diversion under Penal Code section 1001.36 is timely if not made prior to a jury's adjudication of guilt. We conclude that the statute requires a request to be made prior to the return of a verdict and, in so holding, part ways with *People v. Curry* (2021) 62 Cal.App.5th 314 (*Curry*)), but have no occasion to go as far as *People v. Braden* (2021) 63 Cal.App.5th 330, 333 (*Braden*) [diversion may not be sought once trial begins]).

We conclude that her conviction should not be disturbed, and affirm.

2

## FACTS AND PROCEDURAL BACKGROUND

I.    **Facts**

A.    *The relationship*

From 2003 through 2013, Jessalyn Kendy Graham (defendant) and Luke Hardman (Hardman) were in an on-again, off-again dating relationship.  When Hardman broke it off in 2013, they remained cordial:  Defendant moved from the house she shared with him to the studio unit behind the house, and they continued to have sex on a monthly basis.

In early April 2017, Hardman told defendant he had started dating someone else.  Defendant did not take the news well.  In mid-April 2017, defendant and Hardman got into a verbal argument that ended when defendant grabbed Hardman's phone, locked herself in his car, and proceeded to send text messages from Hardman's phone to the woman he was now dating; in those messages, defendant—while posing as Hardman—told his girlfriend that he "missed" defendant and that he and the new girlfriend needed to break up because he could not "do this anymore," and signed off with "I'm sorry. Goodbye."

Upset at her intrusive conduct, Hardman told defendant she had to "pack her things and move out" of the studio.  He also disinvited her from his upcoming graduation ceremony for his master's degree.

B.    *The incident*

1.    *The setup*

On May 6, 2017, defendant had yet to move out of the studio unit and asked Hardman to come by that night to care for her two cats because she said she was feeling suicidal.

3

When Hardman went to defendant's studio unit to bring the cats to the main house, defendant asked him to come back 30 minutes later. Toward the end of that period, she called the nonemergency line for the local police. She told the answering officer that she was "looking to file a domestic violence report" because her ex-boyfriend had become "crazy" and "unstable" after she broke up with him, and had on a previous occasion "held [her] hostage," "choked" her, and "injured" her. She reported being "scared" because she had "no idea what he's capable of."

As Hardman returned per defendant's request, she told the police that he was "right outside [her] door" and hung up.

2. *The attack*

Because defendant had asked Hardman to return and left her front door unlocked, Hardman entered to retrieve the cats. After he did, defendant locked all three locks on the front door. She then started in on him about how it "wasn't fair" that he had asked her not to attend his graduation.

Uninterested in retreading the issue, Hardman decided to leave. Defendant prevented him. She blocked his exit by blocking her front door. He "gently" pushed her aside, but she "jumped" back into his path. He pushed her aside a second time, and she "jumped" back into his path a second time. Then Hardman shoved her "a lot harder," causing her to stumble backward but not fall, and he "bolt[ed]" for the door.

Before he could unlock the locks and leave, defendant stabbed him in the back with an Ikea kitchen knife. They got into a "scuffle," where she proceeded to stab him through the heart and slice him open along his rib cage.

Defendant then proceeded to toy with Hardman as he was bleeding profusely. When he reached for his phone to call 911,

4

defendant took his phone from him to prevent him from calling because, she told him, he was not hurt "that badly" and his call would "get [her] in trouble." Hardman then implored *her* to call 911, and she mocked him by pretending to call 911 without actually doing it. As Hardman slumped to the floor from weakness, defendant put her face in his and asked, "Oh, do you still love me? Are you still in love with me?" When Hardman replied, "Yes, I love you," defendant instructed him to "give [her] one last kiss" to "show [her] [he] love[s her]." Hardman obliged by kissing her on the lips. Defendant then feigned a 911 call a second time.

Hardman told defendant he could feel that his bowels were about to release, and asked her to help him to the bathroom. With her help, Hardman stumbled to the bathroom, but only sat on the toilet for a moment before collapsing onto the floor. When Hardman then begged her to "please call 911," she finally did so.

3.    *Defendant's postattack reports of violence*

On the two back-to-back 911 calls she made and in a voluntary interview with the responding officers, defendant offered conflicting accounts of what had happened. On the 911 calls, she reported that a man who was both her "ex" and her "fiancé" "came at her" and she had to "stab him" to protect herself because she was afraid he would "hurt [her] again" like he did in mid-April when he "held [her] hostage." In the subsequent interview, she reported that Hardman had shown up that night wielding a green-handled knife and proceeded to strangle her. However, police found no green-handled knife at the scene, and defendant had no injuries except a small laceration on her right bicep that was not a recent injury. Indeed, defendant reported she was not in pain at all.

## II.    Procedural Background

On October 30, 2018, a grand jury indicted defendant for attempted premeditated murder (Pen. Code, §§ 187, subd. (a), 664, subd. (a)).[1]  The indictment further alleged that defendant had personally used a deadly or dangerous weapon (§ 12022, subd. (b)(1)) and had personally inflicted great bodily injury (§ 12022.7).  The People proceeded by way of grand jury because defendant had repeatedly refused to come to court for the preliminary hearing.

At her second court appearance on November 26, 2018, the trial court granted defendant's request to represent herself.  The court appointed standby counsel.

After the trial court continued the matter several times at defendant's request,[2] the matter proceeded to a jury trial. Midway through the People's case, defendant relinquished her right of self-representation and standby counsel took over.  The court instructed the jury on the crime of attempted murder as well as the special finding of premeditation, and on the lesser included offense of attempted voluntary manslaughter due to imperfect self-defense.

The jury found defendant guilty of attempted premeditated murder and found true the weapon and great bodily injury enhancements.

After the trial court denied defendant's motion for a new trial on the basis of newly discovered evidence, the trial court sentenced defendant to prison for life with the possibility of

_____

1    All further statutory references are to the Penal Code unless otherwise indicated.

2    The continuances are recounted in greater detail in Part II.B of the Discussion.

6

parole plus six years (calculated as five years for the weapon enhancement plus one year for the great bodily injury enhancement).

Defendant filed this timely appeal.

## DISCUSSION

### I.    Instructional Issues

Defendant argues that the trial court made two instructional errors.  We independently review the jury instructions.  (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)

#### A.    *Failure to instruct on the lesser included offense of attempted voluntary manslaughter due to heat of passion*

Defendant argues that the trial court had a sua sponte duty to instruct the jury on the lesser included offense of attempted voluntary manslaughter due to heat of passion.

A trial court has a duty to instruct a jury on ""“all general principles of law relevant to the issues raised by the evidence,”"" including on any ""“lesser included offenses.”"" (*People v. Whalen* (2013) 56 Cal.4th 1, 68.)  Attempted voluntary manslaughter due to heat of passion is a lesser included offense to attempted murder (*People v. Speight* (2014) 227 Cal.App.4th 1229, 1241 (*Speight*)), and rests on a finding that the defendant—both subjectively and reasonably—committed her crime "while under 'the actual influence of a strong passion' induced by [the victim's] provocation." (*People v. Moye* (2009) 47 Cal.4th 537, 550; accord, *People v. Nelson* (2016) 1 Cal.5th 513, 539.)  This occurs when the defendant's "reason ""was obscured or disturbed by passion"" to so great a degree that an ordinary person would ""act rashly and without deliberation and reflection."""" (*People v. Vargas* (2020) 9 Cal.5th 793, 828 (*Vargas*).)

7

We need not decide whether the trial court erred in not instructing the jury on the lesser included offense of attempted voluntary manslaughter due to heat of passion because its omission was harmless beyond a reasonable doubt.  "Error in failing to instruct the jury on a lesser included offense is harmless when the jury necessarily decides the factual questions posed by the omitted instructions adversely to [the] defendant under other properly given instructions."  (*People v. Lewis* (2001) 25 Cal.4th 610, 646.)

Here, the jury's finding that defendant's attempted murder was willful, premeditated and deliberate necessarily decided that defendant did *not* act under the "actual influence of a strong passion," and hence did not commit the crime of attempted voluntary manslaughter due to heat of passion, thereby rendering harmless the absence of an instruction for this crime. The jury instruction in this case defining when an attempted murder is willful, premeditated and deliberate (CALCRIM No. 601) states that "[a] decision to kill made rashly, impulsively, or without careful consideration of the choice and its consequences is not deliberate and premeditated."  This is the antithesis of """"act[ing] rashly and without deliberation""""" (*Vargas*, *supra*, 9 Cal.5th at p. 828.)  Thus, as the weight of precedent agrees, a jury's finding that a murder or attempted murder was willful, premeditated and deliberate is "manifestly inconsistent with having acted under the heat of passion" and thus renders harmless the failure to instruct on a lesser included offense resting on a heat-of-passion finding.  (*People v. Wang* (2020) 46 Cal.App.5th 1055, 1071-1072 (*Wang*); *People v. Franklin* (2018) 21 Cal.App.5th 881, 894-895 (*Franklin*); *People v. Peau* (2015)

8

236 Cal.App.4th 823, 831 (*Peau*); *Speight*, *supra*, 227 Cal.App.4th at p. 1246.)

Defendant resists this conclusion with three arguments.

First, she argues that instruction at issue in *Wang* (CALJIC No. 8.20) defined the terms "willful," "deliberate" and "premeditated" differently than the instruction at issue here (CALCRIM No. 601) because the CALJIC No. 8.20 instruction applicable to murder (as well as the CALJIC No. 8.67 instruction applicable to attempted murder) explicitly use the phrase "heat of passion" when they specify that a homicide is not "deliberat[e] and premeditat[ed]" if the defendant formed her "intent to kill" "under a sudden heat of passion or other condition precluding the idea of deliberation." (CALJIC Nos. 8.20, 8.67.) This is true, but irrelevant: *Franklin* held that the CALCRIM No. 601 instruction given in this case also renders harmless the absence of a heat-of-passion-based lesser included offense (*Franklin*, *supra*, 21 Cal.App.5th at pp. 894-895), and, more to the point, the absence of the words "heat of passion" from the CALCRIM No. 601 instruction does not eliminate the "manifest[] inconsisten[cy]" between the jury's finding under the CALCRIM No. 601 instruction that defendant did not act "rashly" or "impulsively" and the finding of acting "rashly" that a jury would need to make to support a conviction of attempted voluntary manslaughter due to heat of passion.

Second, defendant argues that *Wang*, *Franklin*, *Peau* and *Speight* are all wrongly decided. She insists that we must follow *People v. Ramirez* (2010) 189 Cal.App.4th 1483, 1488 (*Ramirez*), which cited our Supreme Court's decision in *People v. Berry* (1976) 18 Cal.3d 509 (*Berry*), for the proposition that a jury's determination of guilt for first degree murder based on

9

premeditation does not render harmless "the erroneous omission of an instruction on heat of passion voluntary manslaughter." Because *Berry* is binding precedent, defendant concludes, we must follow it and reject *Wang*, *Franklin*, *Peau* and *Speight*. However, defendant ignores that a post-*Berry* Supreme Court decision, *People v. Wharton* (1991) 53 Cal.3d 522, 572 (*Wharton*), holds that a "state of mind, involving planning and deliberate action, is manifestly inconsistent with having acted under the heat of passion . . . and clearly demonstrates that defendant was not prejudiced by the failure to give his requested instruction." *Berry* and *Wharton* point in different directions, and we side with the majority of courts in concluding that *Wharton* applies here.

Lastly, defendant argues that following *Wang* and other cases impermissibly shifts the burden of proof to her in violation of due process. This argument is frivolous. What renders the assumed instructional error in this case harmless is *the jury's finding beyond a reasonable doubt* that defendant acted in a willful, deliberate and premeditated fashion. The People had the burden of proving that allegation. That the logical implication of that finding is that any error in not instructing on the lesser included offense at issue here was harmless does not in any way, shape or form shift the burden of proof, which always rested with the People.

### B.    *Misinstruction on the deadly weapon enhancement*

Defendant argues that the trial court erred in instructing on the enhancement for personal use of a deadly weapon.

In pertinent part, the court instructed the jury that a deadly or dangerous weapon is "any object, instrument, or weapon [(1)] *that is inherently deadly or dangerous* or [(2)] one

10

that is used in such a way that it is capable of causing and likely to cause death or great bodily injury." (Italics added.) Because the sole weapon at issue in this case was a knife, and because a knife is not an inherently deadly weapon as a matter of law, the People concede that the trial court erred in instructing the jury that a knife could be an "*inherently* deadly or dangerous" weapon. (*People v. Aledamat* (2019) 8 Cal.5th 1, 5-8 (*Aledamat*).)

However, this error was harmless. In *Aledamat*, our Supreme Court clarified that the exact instructional error at issue here was effectively no different than an error in "misdescri[bing] . . . the elements" of a crime or enhancement, and thus was subject to harmless error analysis. (*Aledamat*, *supra*, 8 Cal.5th at pp. 9-10.) When an instruction omits or misdescribes an element, we assess whether that error was harmless beyond a reasonable doubt by asking whether "the omitted [or misdescribed] element was uncontested and supported by overwhelming evidence." (*Neder v. United States* (1999) 527 U.S 1, 17; accord, *People v. Mil* (2012) 53 Cal.4th 400, 409.) Here, the instructional error was harmless beyond a reasonable doubt because defendant did not contest—and the evidence was overwhelming—that the kitchen knife she used to stab Hardman repeatedly was "used in such a way that it [was] capable of causing and likely to cause death or great bodily injury."

Defendant makes two arguments in response. First, she asserts that *Aledamat*'s resort to harmless error analysis is inapplicable to specific intent crimes like attempted murder. This assertion misses the mark because the error here pertained to the enhancement for the use of a dangerous or deadly weapon, and that enhancement requires only general intent. Second, she

11

seems to contend that the error was not harmless because she stabbed Hardman after he pushed her away from the front door of the studio unit. This contention also misses the mark because defendants' proffered justification for using the knife does not speak to whether she used it in such a way as to cause death or inflict great bodily injury.

## II.    Denial of Midtrial Continuance

Defendant argues that the trial court erred in denying her request for a one-day continuance after the People had rested its case and in denying her motion for a new trial asserting the same alleged error. We review the denial of a continuance request for an abuse of discretion. (*People v. Mungia* (2008) 44 Cal.4th 1101, 1118 (*Mungia*).) Where, as here, the continuance is requested in the middle of trial, the trial court's discretion is "'substantial,'" such that "'appellate challenges'" to midtrial continuance rulings "'are rarely successful.'" (*People v. Wilson* (2005) 36 Cal.4th 309, 352, quoting *People v. Seaton* (2001) 26 Cal.4th 598, 660.)

### A.    *Pertinent facts*

From the time defendant exercised her right of self-representation in November 2018 to the first day of trial on June 18, 2019, defendant requested—and was granted—several continuances of the trial date to give her ample time to prepare for trial.

Once trial began on June 18, 2019, defendant engaged in a campaign of conduct designed to further postpone or to derail the trial. On June 18, she asked for a 90-day continuance, which the court denied.

Jury selection occupied all day June 19 and June 20, and the morning of June 21.

The People began presenting its case-in-chief during the afternoon of Friday, June 21.

The People were unable to continue their case-in-chief on Monday, June 24 because defendant refused to leave her jail cell that morning. The court issued an extraction order, which prompted defendant to relent and agree to come to court. However, she did not arrive in court until 2:50 pm. Although defendant attributed her refusal to come to court to medical issues, when she was transported to a medical facility after court that afternoon, she refused to answer any questions about her health. The court was forced to order the jury—which had been waiting around all day—to return the next morning.

On the morning of June 25, defendant told the trial court she no longer wished to represent herself. The court then ordered defendant's standby counsel to take over defendant's representation. Standby counsel immediately asked for a continuance of "at least 10 days" to try to get defendant's mental health records from Kaiser and to subpoena a mental health counselor defendant had consulted in April 2017. The court denied that continuance request. The People resumed its case-in-chief for the balance of the morning. After the People put on its last witness in the afternoon and rested, the court recessed for the remainder of the afternoon to give standby counsel the opportunity to marshal whatever defense he wished to present.

On the morning of June 26, standby counsel asked for a one-day continuance so that he could call as a witness the mental health counselor whom defendant had consulted after defendant's mid-April encounter with Hardman but before the May 6 stabbing. Standby counsel proffered that the counselor would testify that defendant had reported being the victim of domestic

13

violence in mid-April. The trial court denied the continuance on the grounds that (1) defendant had not previously identified this counselor as a witness when asked to list her anticipated witnesses, and (2) the counselor's testimony regarding domestic violence would not be relevant "unless there's evidence that [defendant] is the victim of domestic violence" and defendant had opted not to testify. Defendant called one character witness, and then rested.

## B. *Analysis*

A continuance in a criminal case may only be granted for good cause. (§ 1050, subd. (e); *Mungia, supra,* 44 Cal.4th 1101, 1118.) When a defendant requests a continuance in the middle of trial, she must as a threshold matter "'show [s]he exercised due diligence in preparing for trial.'" (*People v. Fudge* (1994) 7 Cal.4th 1075, 1106 (*Fudge*), quoting *People v. Danielson* (1992) 3 Cal.4th 691, 705; *People v. Winbush* (2017) 2 Cal.5th 402, 469-470.) If that threshold showing is made, then the trial court must evaluate whether good cause justifies the continuance by examining (1) how the defendant will benefit from the continuance, (2) the likelihood that benefit will come to pass, (3) the burden of the requested continuance on other witnesses, the jurors, and the court, and (4) whether the requested continuance would further or undermine substantial justice. (*People v. Panah* (2005) 35 Cal.4th 395, 423.)

The trial court did not abuse its discretion in denying defendant's midtrial request for one-day continuance for two reasons.

First, defendant did not meet her burden of showing that she had exercised due diligence in preparing for trial. During the seven months defendant represented herself, the trial court

14

repeatedly asked her if she wished to continue representing herself, repeatedly advised her of the importance of being prepared for trial, and repeatedly asked defendant to identify which witnesses she intended to call. The mental health counselor was not one of the witnesses defendant identified, even though defendant had consulted the counselor prior to the charged crime and was obviously aware of her meeting with that counselor. Although *standby counsel* did not evince any lack of diligence, the trial court had repeatedly warned defendant that standby counsel would have to "rely[] on [defendant's] workup of the case" should she relinquish her right of self-representation. Defendant's decision not to prepare for trial notwithstanding the trial court's prescient advisements means that defendant was aware of the risks arising from her lack of preparation and nevertheless chose to take them. (See *Fudge, supra*, 7 Cal.4th at p. 1107 [denial of continuance appropriate where "the record shows that defense counsel had been warned repeatedly by the trial court to have their defense ready"].)

Second, the trial court did not abuse it discretion in balancing the pertinent factors and concluding that defendant had not otherwise established "good cause" for the midtrial continuance sought by standby counsel. The counselor's testimony was unlikely to appreciably benefit defendant because the jury had already heard defendant's statements on the 911 calls as well as her pre- and postattack statements to police claiming that Hardman had previously abused her. Evidence that defendant had also repeated that account of events to a counselor adds very little. Defendant urges that the counselor would have testified that defendant showed her a bruise, but this evidence was not shared with the trial court until defendant's

15

*new trial* motion (and thus was not part of the trial court's calculus in denying a continuance) and also adds very little because it is dependent upon the jury crediting defendant's explanation to the counselor about the source of the bruise. There is no question that further continuing the trial would have inconvenienced the jurors, who had already suffered through one wasted day and one abbreviated day of trial due to defendant's "antics" and "delay" "tactic[s]." In light of these considerations, delaying the trial further would have undermined—rather than furthered—"substantial justice."

Defendant offers two further arguments in support of her position that denying her the continuance was error. She asserts that no witnesses would have been inconvenienced because the People had rested its case-in-chief by the time standby counsel asked for the continuance, but this ignores the inconvenience to the jurors. Defendant also contends that the counselor's recounting of defendant's statements to her would have been admissible under the rules of evidence, but that recounting—even if admitted—would have added almost nothing to the body of evidence already before the jury.

## III. Failure to Conduct a Second Competency Trial

Defendant argues that the trial court erred in not declaring a second doubt about her competency to stand trial. We review a trial court's determination of competency for substantial evidence. (*People v. Blacksher* (2011) 52 Cal.4th 769, 797 (*Blacksher*).)

### A. *Pertinent facts*

In late 2017 (before defendant was indicted), defendant's attorney raised a doubt about defendant's competency, the trial court declared a doubt, and defendant's competency was

16

evaluated. The mental health court found defendant to be competent to stand trial.

Nearly two years later, at a pretrial hearing on May 1, 2019, defendant—while representing herself—asked the trial court if she could be sent back to the mental health court to evaluate her competence because, in her view, the Sheriff's Department had said she was not competent. The court responded that the Sheriff's Department had not raised any doubt about defendant's competence; instead, the Department had placed her on suicide watch. The court further stated that it had "not seen one iota of anything . . . any of the times [defendant had] come before this court to suggest that [defendant was] incompetent." Defendant also informed the court that she "absolute[ly]" "fe[lt]" "competent to represent [her]self."

In the middle of trial, after defendant had relinquished her right of self-representation, the court asked standby counsel and defendant whether defendant intended to testify. Standby counsel relayed that defendant "doesn't feel comfortable testifying absent discussing this with a therapist." When asked to explain, defendant elaborated that she "would feel more comfortable if [she] was evaluated by [a] mental psych[ologist] before [she got] on the stand" because she "want[ed] to make sure [she was] mentally sound, [that she was] okay, and [that she] won't break down" when going "through the trauma" of testifying.

## B. *Analysis*

As a matter of due process, a criminal defendant may not be tried or convicted while mentally incompetent. (*People v. Rodas* (2018) 6 Cal.5th 219, 230 (*Rodas*); *People v. Sattiewhite* (2014) 59 Cal.4th 446, 464 (*Sattiewhite*); *Pate v. Robinson* (1966) 383 U.S. 375, 384-386.) For these purposes, a defendant is

17

mentally incompetent if she (1) ""“lacks a '“sufficient present ability to consult with [her] lawyer with a reasonable degree of rational understanding”'”"” of the proceedings against her, or (2) lacks "“"“a rational as well as a factual understanding of the proceedings against [her].”"""” (*Sattiewhite*, at p. 464, quoting *Dusky v. United States* (1960) 362 U.S. 402, 402; *Rodas*, at pp. 230-231.) A trial court is required to suspend criminal proceedings and conduct a full competency trial if substantial evidence, even if conflicting, raises a reasonable doubt regarding the defendant's mental competence. (§ 1368, subds. (a) & (b); *People v. Lightsey* (2012) 54 Cal.4th 668, 691; *People v. Welch* (1999) 20 Cal.4th 701, 737-738.) Where, as here, a defendant has already been found competent to stand trial after a competency hearing, "a trial court may rely on that finding [going forward] unless the court '“is presented with a substantial change of circumstances or with new evidence" casting a serious doubt on the validity of that finding.'" (*Rodas,* at p. 231 quoting *People v. Jones* (1991) 53 Cal.3d 1115, 1153.) Because a defendant is presumed to be competent, the burden rests with the defendant to establish the requisite substantial change of circumstances or new evidence casting a serious doubt on the prior finding of competence. (See *Blacksher*, *supra*, 52 Cal.4th 769, 797.)

Defendant did not carry her burden. She points to two events that, in her view, constitute a "change of circumstances or new evidence casting a serious doubt" on her competency—(1) the fact she was placed on suicide watch on May 1, 2019, and (2) her request to consult with a therapist before taking the stand in her own defense. However, neither casts a serious doubt on the validity of the prior finding of competence. Suicidal ideation may be enough to raise a doubt about one's competence if it is

18

combined with other factors and if there has been no prior finding of competency. (See *People v. Rogers* (2006) 39 Cal.4th 826, 848; *People v. Johnson* (2019) 21 Cal.App.5th 267, 276.) But here, there are no other factors and there was a prior finding of competency. And defendant's desire to consult with a therapist to make sure she did not "break down" on the stand in view of jury does not evince a lack of present ability to consult with her lawyer *or* a lack of rational, factual understanding of the proceedings. To the contrary, defendant's concern about how she might appear to the jury evaluating her fate is proof that she was keenly aware of what was going on and what was at stake. This concern, coupled with defendant's ability to conduct voir dire and cross-examine the People's witnesses during the first half of the trial, provided the trial court with an ample basis to conclude that nothing had changed after the first competency hearing. Indeed, the trial court was also well within its discretion to view defendant's long history of requesting multiple continuances, of misconduct while in custody, and of feigning medical issues during trial as part of an overall stratagem of "playing games" in order to "delay the proceedings as long as [she] can," a goal that evinces—and *presupposes*—a full appreciation and understanding of the events happening around her.

Defendant responds with three arguments. First, she argues that her placement on suicide watch automatically entitles her to a second competency hearing. As noted above, it does not. Second, she argues that Hardman's testimony before the grand jury that defendant was "sort of degrading mentally" prior to the May 2017 incident attests to her lack of competence to stand trial. This is triply irrelevant: Hardman's opinion is, at most, a lay opinion; his opinion spoke to her competence in

19

general, not to the particularized lack of competence to assist counsel and understand legal proceedings; and his opinion pertained to defendant's mental state in early 2017—long *before* the mental health court found her to be competent to stand trial. Lastly, defendant argues that her standby counsel expressed a doubt about her competency when he started to say "My client advises me as far as her competency and her ability—" before the trial court cut him off and reminded him not to relay client confidences. Standby counsel then stated that defendant did not "feel comfortable testifying absent discussing this with a therapist." Thus, standby counsel never declared a doubt; he relayed defendant's preference to meet with a therapist before testifying which, as we have explained, does not constitute a change of circumstance or new evidence casting serious doubt on the prior finding of her competency.

## IV.   Diversion

Defendant argues that this matter should be remanded to the trial court for the court to exercise its discretion under Section 1001.36 to "grant pretrial diversion" to persons who "suffer[] from a mental disorder" that was a "significant factor in the commission" of the charged crime(s). (§ 1001.36, subds. (a) & (b).) Because section 1001.36 became effective *before* defendant was indicted, *before* she went to trial*, before* she was found guilty, *before* sentencing and *before* judgment was entered by the trial court, defendant's argument presents the question: Is a request for "pretrial diversion" under section 1001.36 timely when it is made for the first time on appeal? We conclude that the answer is "no," and do so for two reasons.

First and foremost, we hold that a request for "pretrial diversion" under section 1001.36 is timely only if it is made prior

20

to the jury's guilty verdict.  This holding is a function of the plain language of the statute, is consistent with its purpose and steers clear of the likely practical consequences of a contrary reading.

Section 1001.36 explicitly defines "pretrial diversion" as "the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged *until adjudication*."  (§ 1001.36, subd. (c), italics added.)  The statute's use of the phrase "pretrial diversion" by itself strongly suggests a timing requirement.  After all, "pretrial" exists in contradistinction to posttrial, and "pretrial *diversion*" connotes a diversion away from trial.  One cannot divert a river *after* the point at which it has reached the sea.  (See *Braden, supra*, 63 Cal.App.5th 330, 333-334 [noting that statute uses "pretrial" "five times"].)  This linguistic suggestion is confirmed to be an outright command by the definition section 1001.36 gives to the phrase "pretrial diversion":  The definition says that diversion must occur before "adjudication," and "adjudication" typically refers to an adjudication of guilt—whether by plea by or by jury verdict.  (See *In re Harris* (1989) 49 Cal.3d 131, 135.)  The plain text of section 1001.36 is controlling.  (See *Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1131.)

The tripartite purposes of section 1001.36 are to (1) "[i]ncrease[] diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety," (2) "[a]llow[] local discretion and flexibility for counties in the development and implementation of diversion for individuals with mental disorders across a continuum of care settings," and (3) "[p]rovid[e] diversion that meets the unique mental health treatment and

21

support needs of individuals with mental disorders." (§ 1001.35.) These purposes are fully served by allowing defendants to seek mental health pretrial diversion prior to adjudication of their guilt. Although our Supreme Court has favorably cited language from other cases indicating that our "'Legislature intended the mental health diversion program *to apply as broadly as possible*'" (*People v. Frahs* (2020) 9 Cal.5th 618, 632 (*Frahs*), italics added), that language does not give us warrant to ignore the language of the statute—which is the key determinant of what is "possible."

Were we to construe section 1001.36 to permit a defendant to seek pretrial diversion after the adjudication of guilt or after a plea (ostensibly, by construing the term "adjudication" to mean "entry of judgment"), we would be inviting the inefficient use of finite judicial resources. If a defendant knows that pretrial diversion is available even after going to trial, why not see what happens at trial and then, if the jury returns a guilty verdict, seek pretrial diversion? Does a defendant receive ineffective assistance of counsel if her lawyer does *not* take this approach? This would turn trial into a "read through" by dedicating the time and effort of judges, jurors and lawyers into a proceeding that may become retroactively moot should pretrial diversion be requested following a guilty verdict. (See *Braden*, *supra*, 63 Cal.App.5th at pp. 341-342.) In the absence of language expressly mandating this result, we decline to construe section 1001.36 in such a manner. (*People v. Hazle* (2007) 157 Cal.App.4th 567, 573 [construing a statute to avoid "an absurd waste of judicial resources"]; *Landrum v. Superior Court* (1981) 30 Cal.3d 1, 9 [same].)

Our analysis is consistent with our Supreme Court's decision in *Frahs*, *supra*, 9 Cal.5th 618. The question presented

22

in *Frahs* was whether defendants who went to trial *before* section 1001.36 took effect could seek pretrial diversion after their guilt was adjudicated as long as their convictions were not yet final. The resolution of that question turned on whether the Legislature, in enacting section 1001.36, had "'clearly signal[ed] its intent'" to overcome the presumption erected by *In re Estrada* (1965) 63 Cal.2d 740 that statutes having an ameliorative effect in criminal cases apply retroactively to convictions that are not yet final. (*Id.* at pp. 631-632.) *Frahs* ruled that the "until adjudication" language in section 1001.36 did not constitute that "clear" signaling (*id.* at p. 633), such that defendants whose convictions were in the "pipeline" of direct appellate review when section 1001.36 took effect could still take advantage of the statute. But *Frahs* was careful to limit its analysis to the availability of section 1001.36 to these "pipeline defendants," and to note that its holding involved a "quite different" question from how the "statute normally will apply going forward" as to defendants who had had the opportunity seek pretrial diversion from the very beginning. (*Id.* at p. 633.)

In reaching our conclusion, however, we part ways with *Curry*, *supra*, 62 Cal.App.5th 314. *Curry* held that a request for pretrial diversion under section 1001.36 is timely as long as it is made "before sentencing." (*Id.* at pp. 325-326.) In so holding, *Curry* found the holding and analysis in *Frahs* to be "pertinent." (*Id.* at p. 322.) As explained above and as *Frahs* itself was careful to point out, *Frahs* answered a different question and involved a different analysis, neither of which is at issue here. *Curry* acknowledged that the term "adjudication" could be construed to mean "prior to verdict" or "prior to sentencing" (*id.* at pp. 323-324), but ruled that the term meant "prior to sentencing" because

23

section 1001.36 (1) contemplates the trial court's "'review[]'" of "'any relevant and credible evidence, including, but not limited to, police reports, preliminary hearing transcripts, witness statements . . . or evidence that the defendant displayed symptoms consistent with the relevant mental disorder at or near the time of the offense'" (*id.* at p. 324, quoting § 1001.36, subd. (b)(1)(B)), (2) contemplates that the trial court will "'consider the opinions of the district attorney, the defense, or a qualified mental health experience, and . . . the defendant's violence and criminal history, the current charged offense, and any other factors that the court deems appropriate'" (*id.* at p. 325, quoting § 1001.36, subd. (b)(1)(F)), and (3) empowers the trial court to "'require the defendant to make a prima facie showing'" of eligibility for diversion "'[a]t any stage of the proceedings'" (*id.* at p. 325, quoting § 1001.36, subd. (b)(3)). To us, these statutory provisions are insufficient to countermand what we perceive as the otherwise clear intent of the Legislature to require pretrial diversion to be sought before a verdict. Tellingly, the evidence that section 1001.36 spells out as appropriate for a trial court to consider purports to enumerate many examples, all of which can exist prior to trial and none of which arises solely at or after trial. And the power of the court to require a prima facie showing "at any stage of the proceedings" is necessarily limited by the scope of the statute—which requires a request for pretrial diversion to occur prior to a verdict. To uncouple the "any stage of the proceedings" language from the statute's overall scope would allow trial courts to entertain requests while a case is up on appeal because appeal is, in some sense, a "stage of the proceedings." (See *Braden*, *supra*, 63 Cal.App.5th at p. 339.)

24

Because defendant's request for diversion in this case was made for the first time on appeal, we are able to resolve this case by our holding that a request for diversion under section 1001.36 becomes untimely once the jury has returned a verdict. We have no occasion to confront whether such a request is untimely "after trial begins," as *Braden*, *supra*, 63 Cal.App.5th at p. 335 holds. We leave that question for another day.

Second, and alternatively, the onus is placed on the defendant to raise the issue of diversion. Section 1001.36, subdivision (b)(1)(A) provides, "Evidence of the defendant's mental disorder shall be provided by the defense and shall include a recent diagnosis by a qualified mental health expert." By not invoking section 1001.36 for the nearly 12 months the statute was effective before the jury returned its verdict, she has forfeited her right to do so now. (See *People v. Carmony* (2004) 33 Cal.4th 367, 375-376 [failure to seek dismissal under section 1385 forfeits right to raise issue for first time on appeal]; see also *People v. Scott* (1994) 9 Cal.4th 331, 353 [failure to object to discretionary sentencing choices below forfeits right to challenge them on appeal].)

Defendant cannot blame her counsel for either deficiency, as she invoked her right to self-representation from her second court appearance in November 2018 until midway through her trial in June 2019 and had been warned that her standby counsel would inherit the trial as she had prepared it. (*People v. Michaels* (2002) 28 Cal.4th 486, 525 ["'[A] self-represented defendant may not claim ineffective assistance on account of counsel's omission to perform an act within the scope of duties the defendant voluntarily undertook to perform personally . . .'"].) Because there was no evidence offered at trial that defendant

25

suffered from a mental illness, and it is reasonable to assume that defense counsel was aware of a statute in effect for almost an entire year before trial *began,* diversion was not appropriately raised.

## DISPOSITION

The judgment is affirmed.

**CERTIFIED FOR PARTIAL PUBLICATION**.


_____, J.

HOFFSTADT


We concur:


_____, Acting P. J.

ASHMANN-GERST


_____, J.

CHAVEZ